**FITZGERALD MONROE FLYNN PC**
JACK FITZGERALD (SBN 257370)
*jfitzgerald@fmfpc.com*
MELANIE R. MONROE (SBN 275423)
*mmonroe@fmfpc.com*
TREVOR FLYNN (SBN 253362)
*tflynn@fmfpc.com*
PETER GRAZUL (SBN 342735)
*pgrazul@fmfpc.com*
ALLISON FERRARO (SBN 351455)
*aferraro@fmfpc.com*
2341 Jefferson Street, Suite 200
San Diego, California 92110
Phone: (619) 215-1741
**Counsel for Plaintiff**

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF CALIFORNIA

LEAH TESTONE, on behalf of herself, all others similarly situated, and the general public,

        Plaintiff,

   v.

GO MACRO, LLC,

        Defendant.

Case No: **'25CV1743 RSH KSC**

CLASS ACTION

**COMPLAINT FOR CONSUMER FRAUD, BREACH OF EXPRESS & IMPLIED WARRANTIES, NEGLIGENT AND INTENTIONAL MISREPRESENTATION, AND UNJUST ENRICHMENT**

DEMAND FOR JURY TRIAL

Plaintiff Leah Testone, on behalf of herself, all others similarly situated, and the general public, by and through her undersigned counsel, brings this action against Defendant Go Macro, LLC ("Go Macro"), and alleges the following upon her own knowledge, or where she lacks personal knowledge, upon information and belief, including the investigation of her counsel.

## INTRODUCTION

1.     Go Macro manufactures and sells a variety of snack bars under the "GoMacro" brand, broadly divided into Protein Bars, Snack Bars, and Kids MacroBars (the "Products"[1]).

2.     Go Macro labels the Products with claims intended to appeal to health-conscious consumers. For example, the Products' labeling says, "Finally – a bar that's both delicious and good for you!" It claims the Products promote a "healthy body." Through the use of both words and vignettes, the labels claim, "Live Long," "Eat Positive," and "Be Well," along with a heart vignette, implying the bars are heart-healthy.

3.     This misleading labeling message is reinforced by non-label advertising, including on Go Marco's website, testimonials, and Go Macro health blog.

4.     Despite representing that the Products are healthy, the Protein Bars actually contain 7-13 grams of added sugar, representing 11-19% of the calories in the Products. The Snack Bars contain 9-10 grams of added sugar, representing 14-20% of calories. And the Kids Bar—which Defendant knows are consumed by children as young as one-year old—contain 4-6 grams of added sugar, representing 14-24% of those bars' calories.

---

[1] The Products include at least the following varieties and flavors: **(1) Protein Bars:** White Chocolate + Macadamia Nuts, Oatmeal Chocolate Chip, Peanut Butter Chocolate Chip, Coconut + Almond Butter + Chocolate Chips, Double Chocolate + Peanut Butter Chips, Salted Caramel + Chocolate Chip, Dark Chocolate + Almonds, Mint Chocolate Chip, Peanut Butter, Mocha Chocolate Chip, Blueberry + Cashew Butter, Banana + Almond Butter, Maple Sea Salt, Sunflower Butter + Chocolate, and Lemon + Lemon; **(2) Snack Bars:** Cherries + Berries, and Granola + Coconut; and **(3) GoMacro Kids MacroBars**: Cinnamon Roll, Chocolate Chip Cookie Dough, Double Chocolate Brownie, Oatmeal Chocolate Chip, and Peanut Butter Cup. To the extent Go Macro sold other varieties with high levels of added sugar, including seasonal varieties, and their labels contained a misleading claim alleged herein, this Complaint should be read to be inclusive, rather than exclusive, of those varieties.

*Testone v. Go Macro, LLC*
CLASS ACTION COMPLAINT

5.       Contrary to the health-focused marketing of the Products, a vast body of reliable scientific evidence establishes that excessive consumption of added sugar—any amount above approximately 5% of daily caloric intake—is toxic to the human body and greatly increases the risk of cardiovascular disease, diabetes, liver disease, and a wide variety of other chronic diseases. Based on this scientific evidence, the FDA recently promulgated a regulation that prevents most foods from using "healthy" as a nutrient content claim if they contain more than 2 grams of added sugar in a serving.

6.       Because loading the Products with added sugar and marketing them as "good for you" is contrary to the science, Go Macro's claims are false and highly misleading.

7.       Plaintiff brings this action against Go Macro on behalf of herself, similarly-situated Class Members, and the general public, to enjoin Go Macro from deceptively marketing the Products, and to recover compensation for injured Class Members.

## JURISDICTION & VENUE

8.       This Court has original jurisdiction over this action under 28 U.S.C. § 1332(d)(2) (The Class Action Fairness Act) because the matter in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs, and at least one member of the class of Plaintiff is a citizen of a State different from Go Macro. In addition, more than two-thirds of the members of the class reside in states other than the state in which Go Macro is a citizen and in which this case is filed, and therefore any exceptions to jurisdiction under 28 U.S.C. § 1332(d) do not apply.

9.       The Court has personal jurisdiction over Go Macro because it has purposely availed itself of the benefits and privileges of conducting business activities within California, including by distributing and selling the Products in California.

10.      Venue is proper in this Southern District of California pursuant to 28 U.S.C. § 1391(b) and (c), because Go Macro resides (*i.e.*, is subject to personal jurisdiction) in this district, and because a substantial part of the events or omissions giving rise to the claims occurred in this district.

*Testone v. Go Macro, LLC*
CLASS ACTION COMPLAINT

**PARTIES**

11.    Plaintiff Leah Testone is a citizen and resident of San Diego County, California and intends to remain there.

12.    Defendant Go Macro, LLC is a Wisconsin Limited Liability Company with its principal place of business in Viola, Wisconsin.

**FACTS**

**I.    GO MACRO MARKETS THE PRODUCTS AS HEALTHY FOOD CHOICES**

13.    During at least the four years preceding the filing of this Complaint and continuing today, Go Macro has sold and marketed the Products to consumers in California and throughout the United States.

**A.    To Maximize Profits, Go Macro Markets the Products to Convince Consumers They are Healthy**

14.    Go Macro is well aware consumers are willing to buy and to pay more for foods they perceive as healthy. For example, on its website, Go Macro links to a Forbes article titled "Who Runs the Better-For-You-Food World? These 6 Women" (which includes the CEO & Cofounder of Go Macro), stating, "[c]onsumers are growing increasingly savvy about what goes into the food they eat" and that "they're voting with their dollars for organic, natural products without chemicals and additives."

15.    As Nielsen's 2015 Global Health & Wellness Survey found, "88% of those polled are willing to pay more for healthier foods."

16.    And as a recent systematic review found, in 88.5% of studies considered, consumers were willing to pay more, up to 91.5% more (with a mean of ~30.7% price premium), for "healthier" food products.[2]

---

[2] Alsubhi, M, et al., *Consumer willingness to pay for healthier food products: A systematic review*, Obes. Rev. (2023), *available at* https://pubmed.ncbi.nlm.nih.gov/36342169.

*Testone v. Go Macro, LLC*
CLASS ACTION COMPLAINT

17.    Accordingly, Go Macro employs a strategic marketing campaign designed to convince consumers its Products are healthier than they actually are. This includes labeling the Products with the following claims:

- "Finally – a bar that's both delicious and good for you!";

- "Live Long,";

- "Eat Positive,";

- "Be Well";

- "have a healthy body"; and

- a heart vignette.

18.    The Products' packaging and labeling is depicted below:



*Testone v. Go Macro, LLC*
CLASS ACTION COMPLAINT

19.    Further bolstering the health message, Go Macro's website claims it "believe[s] in the power of a balanced, plant-based lifestyle that is good for you," and that "all of [its] products provide a nutritional benefit[.]"

20.    Through the use of consumer testimonials, Go Macro further advertises its Products as "healthy snacks" for adults and kids.



> ★★★★★
>
> "Love the bars so much. My kids and friends love them and they are healthy snacks that I feel safe giving my kids."
>
> - Alyssa M.

★ ★ ★ ★ ★

**Nicole**

December 19, 2023

Soft/chewy texture and my kids literal favorite thing to eat. My 1 year old walks out with the whole box of bars every morning and throughout the day. My 3 year old opens his eyes and says "macro bar". No exaggeration. Thank you for creating these little pieces of gold that I know are healthy bites going into growing tiny humans. If they could live off of these, they would.

21.    The testimonials demonstrate consumers further believe, for example, they are purchasing "[d]elicious bars that are healthy[,]" and "[r]eplac[ing] . . . unhealthy lunch habits" by consuming the Products.

★ ★ ★ ★ ★

**laura b.**

April 17, 2025

Delicious bars that are healthy . My 3 year old grand daughter loves them !

★ ★ ★ ★ ★

**Jay**

November 15, 2024

By far the best flavor. Replaced my unhealthy lunch habits and I feel so much better.

5

## II.  CONSUMING FOODS HIGH IN ADDED SUGAR IS DETRIMENTAL TO HEALTH

### A.  Added Sugar Consumption Increases Risk of Cardiovascular Heart Disease and Mortality

22.  Cardiovascular diseases affect nearly half of American adults.[3]

23.  Cardiovascular Heart Disease (CHD) is the leading cause of death for men and women in the United States.[4] Approximately 20 million adults in the United States age twenty and older have coronary artery disease (CAD), which is the most common type of CHD.[5] In 2020, CAD killed more than 380,000 people.[6] Every year, more than 800,000 people in the United States have a heart attack.[7]

24.  Data obtained from National Health and Nutrition Examination surveys (NHANES) demonstrate that adults who consumed 10% - 24.9% of their calories from added sugar had a 30% greater risk of cardiovascular disease (CVD) mortality than those who consumed 5% or less of their calories from added sugar. In addition, those who consumed 25% or more of their calories from added sugar had an average 275% greater risk of CVD mortality than those who consumed less than 5% of calories from added sugar. Thus, "[t]she risk of CVD mortality increased exponentially with increasing usual percentage of calories from added sugar[.]"[8]

---

[3] American Heart Association News, "Cardiovascular diseases affect nearly half of American adults, statistics show" (Jan. 31, 2019), *available at* https://www.heart.org/en/news/2019/01/31/cardiovascular-diseases-affect-nearly-half-of-american-adults-statistics-show.

[4] Centers for Disease Controls and Prevention, "Heart Disease Facts," https://www.cdc.gov/heartdisease/facts.htm (citing National Center for Health Statistics, *Multiple Cause of Death 2018–2021 on CDC WONDER Database*, https://wonder.cdc.gov/mcd.html).

[5] *Id.*

[6] *Id.*

[7] *Id.*

[8] Quanhe Yang et al., *Added Sugar Intake and Cardiovascular Diseases Mortality Among US Adults*, JAMA Intern. Med., at E4-5 (Feb. 3, 2014).



25.    In a study of preschool children published in January 2020, researchers found that higher consumption of added sugar was significantly associated with elevated CMR (cardiometabolic risk) scores. The researchers stated that their "findings support recommendations to limit overall intake of SCB [sugar-containing beverages] in early childhood, in [an] effort to reduce the potential long-term burden of CMR."[9]

26.    In another prospective cohort study, consumption of added sugar was significantly shown to increase risk of CHD, as well as adverse changes in some blood lipids, inflammatory factors, and leptin.[10]

---

[9] Karen M. Eny et al., *Sugar-containing beverage consumption and cardiometabolic risk in preschool children*, PREV. MED. REPORTS 17 (Jan. 14, 2020).

[10] Lawrence de Koning et al., *Sweetened beverage consumption, incident coronary heart disease, and biomarkers of risk in men*, CIRCULATION, Vol. 125, pp. 1735-41 (2012).

27.     Added sugar consumption is also associated with several CHD risk factors, such as dyslipidemia,[11] obesity,[12] and increased blood pressure.[13]

**B.     Added Sugar Consumption Increases Risk of Type 2 Diabetes**

28.     Diabetes affects 37.3 million Americans (approximately 1 in 10), and 96 million American adults (more than 1 in 3) have prediabetes.[14] It can cause kidney failure, lower-limb amputation, and blindness. In addition, diabetes doubles the risk of colon and pancreatic cancers and is strongly associated with coronary artery disease and Alzheimer's disease.[15]

29.     Globally, countries where sugar consumption is highest have the highest rates of type 2 diabetes, while those with the lowest consumption have the lowest rates.[16] An econometric analysis of repeated cross-sectional data published in 2013, for example, established a causal relationship between sugar availability and type 2 diabetes. After

[11] Sharon S. Elliott et al., *Fructose, weight gain, and the insulin resistance syndrome*, AM. J. CLIN. NUTR., Vol. 76, No. 5, pp. 911-22 (2002).

[12] Myles S. Faith et al., *Fruit juice intake predicts increased adiposity gain in children from low-income families: weight status-by-environment interaction*, PEDIATRICS, Vol. 118 (2006) ("Among children who were initially either at risk for overweight or overweight, increased fruit juice intake was associated with excess adiposity gain, whereas parental offerings of whole fruits were associated with reduced adiposity gain."); Matthias B. Schulze et al., *Sugar-sweetened beverages, weight gain, and incidence of type 2 diabetes in young and middle-aged women*, JAMA, Vol. 292, No. 8, pp. 927-34 (2004) [hereinafter "Schulze, *diabetes in young and middle-aged women*"]; DS Ludwig et al., *Relation between consumption of sugar-sweetened drinks and childhood obesity: a prospective, observational analysis*, LANCET, Vol. 257, pp. 505-508 (2001); B A Dennison et al., *Excess fruit juice consumption by preschool-aged children is associated with short stature and obesity*, PEDIATRICS, Vol. 99, pp. 15-22 (1997).

[13] Erin Hoare et al., *Sugar- and Intense-Sweetened Drinks in Australia: A Systematic Review on Cardiometabolic Risk*, NUTRIENTS, Vol. 9, No. 10 (2017).

[14] *See* https://www.cdc.gov/diabetes/library/spotlights/diabetes-facts-stats.html.

[15] Javier Aranceta Bartrina & Carmen Pérez Rodrigo, *Association between sucrose intake and cancer: a review of the evidence*, NUTR. HOSP., Vol. 28 (Suppl. 4), 95-105 (2013); Custodia García-Jiménez et al., *A new link between diabetes and cancer: enhanced WNT/beta-catenin signaling by high glucose*, J. MOL. ENDROCRINOL., Vol. 52, No. 1 (2014); Gerard J. Linden et al., *All-cause mortality and periodontitis in 60-70-year-old men: a prospective cohort study*, J. CLIN. PERIODONTAL., Vol. 39, No. 1, 940-46 (Oct. 2012).

[16] Praveen Weeratunga et al., *Per capita sugar consumption and prevalence of diabetes mellitus--global and regional associations*, BMC PUB. HEALTH, 2014 (Feb. 20, 2014).

adjusting for a wide range of confounding factors, researchers found that an increase of 150 calories per day related to an insignificant 0.1% rise in diabetes prevalence by country, while an increase of 150 calories per day in sugar related to a 1.1% rise in diabetes prevalence by country, a statistically significant 11-fold difference.[17]

30.    An analysis of data for more than 50,000 women from the Nurses' Health Study,[18] during two 4-year periods (1991-1995 and 1995-1999), showed, after adjusting for confounding factors, that women who consumed 1 or more sugar-sweetened soft drink per day—equivalent to 140-150 calories and 35-37.5 grams of added sugar—had an 83% greater relative risk of type 2 diabetes compared with those who consumed less than 1 such beverage per month.[19]

31.    The link between sugar intake and diabetes still holds even after controlling for total calorie intake, body weight, alcohol consumption and exercise.[20]

C.    **Added Sugar Consumption Increases Risk of Metabolic Disease**

32.    Metabolic syndrome is a group of conditions that together raise the risk of type 2 diabetes, cardiovascular disease, obesity, polycystic ovary syndrome, nonalcoholic fatty liver disease, and chronic kidney disease. Metabolic syndrome is defined as the presence of any three of the following:

---

[17] Sanjay Basu et al., *The Relationship of Sugar to Population-Level Diabetes Prevalence: An Econometric Analysis of Repeated Cross-Sectional Data*, PLOS ONLINE, Vol. 8, Issue 2 (Feb. 27, 2013) [hereinafter "Basu, *The Relationship*"].

[18] The Nurses' Health Study was established at Harvard in 1976, and the Nurses' Health Study II, in 1989. Both are long-term epidemiological studies conducted on women's health. The study followed 121,700 female registered nurses since 1976, and 116,000 female nurses since 1989, to assess risk factors for cancer, diabetes, and cardiovascular disease. The Nurses' Health Studies are among the largest investigations into risk factors for major chronic disease in women ever conducted. *See generally* "The Nurses' Health Study," *at* http://www.channing.harvard.edu/nhs.

[19] Schulze, *diabetes in young & middle-aged women, supra* n.12.

[20] Basu, *The Relationship, supra* n.17.

9

a.    Large waist size (35" or more for women, 40" or more for men);

b.    High triglycerides (150mg/dL or higher, or use of cholesterol medication);

c.    High total cholesterol, or HDL levels under 50mg/dL for women, and 40 mg for men;

d.    High blood pressure (135/85 mm or higher); or

e.    High blood sugar (100mg/dL or higher).

33.    More generally, "metabolic abnormalities that are typical of the so-called metabolic syndrome . . . includ[e] insulin resistance, impaired glucose tolerance, high concentrations of circulating triacylglycerols, low concentrations of HDLs, and high concentrations of small, dense LDLs."[21]

34.    About 1 in 3 adults in the United States have metabolic syndrome, placing them at higher risk for chronic disease.[22]

35.    Defining "metabolic health" as having optimal levels of waist circumference (WC <102/88 cm for men/women), glucose (fasting glucose <100 mg/dL and hemoglobin A1c <5.7%), blood pressure (systolic <120 and diastolic <80 mmHg), triglycerides (<150 mg/dL), and high-density lipoprotein cholesterol (≥40/50 mg/dL for men/women), and not taking any related medication, data from the NHANES Survey 2009-2016 showed prevalence of "metabolic health" in American adults is alarmingly low, even in normal weight individuals.[23]

36.    Excess consumption of added sugar leads to metabolic syndrome by stressing and damaging crucial organs, including the pancreas and liver. When the pancreas, which produces insulin, becomes overworked, it can fail to regulate blood sugar properly. Large

---

[21] Susan K. Fried & Salome P. Rao, *Sugars, hypertriglyceridemia, and cardiovascular disease*, AM. J. CLIN. NUTR., Vol. 78 (suppl.), 873S-80S, at 873S (2003).

[22] *See* https://www.nhlbi.nih.gov/health/metabolic-syndrome (last updated May 18, 2022).

[23] Joana Araújo et al., *Prevalence of Optimal Metabolic Health in American Adults: National Health and Nutrition Examination Survey 2009-2016*, METAB. SYNDR. RELAT. DISORD. (2019).

doses of added sugar can overwhelm the liver, which metabolizes the fructose in the sugar. In the process, the liver will convert excess fructose to fat, which is stored in the liver and released into the bloodstream. This process contributes to key elements of metabolic syndrome, including high blood fats and triglycerides, high cholesterol, high blood pressure, and extra body fat, especially in the belly.[24]

37.     In 2016, researchers conducted a study to determine whether the detrimental effects of dietary sugar were due to extremely high dosing, excess calories, or because of its effects on weight gain, rather than caused by sugar consumption directly.[25] In other words, the researchers dissociated the metabolic effects of dietary sugar from its calories and effects on weight gain.

38.     Because the researchers did not want to *give* subjects sugar to see if they got sick, they instead took sugar away from people who were already sick to see if they got well. But if subjects lost weight, critics would argue that the drop in calories or weight loss was the reason for the clinical improvement. Therefore, the researchers designed the study to be isocaloric, by giving back to subjects the same number of calories in starch that were taken away in sugar. The study involved 43 children, ages 8 to 19, each obese with at least one other co-morbidity demonstrating metabolic problems. All were high consumers of added sugar in their diets.[26]

39.     To perform the study, researchers assessed subjects' home diets by two questionnaires to determine how many calories, and how much fat, protein, and carbohydrate they were eating. Subjects were then tested at a hospital based on their home diets. Then, for the next 9 days, researchers catered the subjects' meals. The macronutrient percentages of fat, protein, and carbohydrate were not changed. Subjects were fed the same calories and

---

[24] Lisa Te Morenga et al., *Dietary sugars and body weight: systematic review and meta-analyses of randomized controlled trials and cohort studies*, BJM (2012).

[25] Robert H Lustig et al., *Isocaloric fructose restriction and metabolic improvement in children with obesity and metabolic syndrome*, OBESITY (SILVER SPRING), Vol. 24, No. 2, 453-60 (Feb. 2016).

[26] *See id.* at 453-54.

11

percent of each macronutrient as their home diet; but within the carbohydrate fraction, researchers took the added sugar out, and substituted starch. For example, researchers took pastries out, and put bagels in; took yogurt out, and put baked potato chips in; took chicken teriyaki out, and put turkey hot dogs in (although subjects were still given whole fruit). Researchers reduced subjects' dietary sugar consumption from 28% to 10% of calories. Researchers also gave subjects a scale to take home, and each day they would weigh themselves. If they were losing weight, they were instructed to eat more. The goal was for subjects to remain weight-stable over the 10 days of study. On the final day, subjects came back to the hospital for testing on their experimental low-added sugar diet. The study team analyzed the pre- and post-data in a blinded fashion so as not to introduce bias.[27]

40.    Researchers analyzed three types of data. First, diastolic blood pressure decreased by 5 points. Second, baseline blood levels of analytes associated with metabolic disease, such as lipids, liver function tests, and lactate (a measure of metabolic performance) all improved significantly. Third, fasting glucose decreased by 5 points. Glucose tolerance improved markedly, and fasting insulin levels fell by 50%. Each of these results was highly-statistically-significant.[28]

41.    In sum, the study indicated that subjects improved their metabolic status in just 10 days, even while eating processed food, just by removing added sugar and substituting starch. The metabolic improvement, moreover, was unrelated to changes in weight or body fat.

**D.    Added Sugar Consumption Increases Risk of Liver Disease**

42.    Added sugar consumption causes serious liver disease, including non-alcoholic fatty liver disease (NAFLD), characterized by excess fat build-up in the liver. Five percent of these cases develop into non-alcoholic steatohepatitis (NASH), scarring as the liver tries to heal its injuries, which gradually cuts off vital blood flow to the liver. About 25% of NASH

---

[27] *See id.* at 454-55.

[28] *See id.* at 455-56.

patients progress to non-alcoholic liver cirrhosis, which requires a liver transplant or can lead to death.[29]

43.    Since 1980, the incidence of NAFLD and NASH has doubled, along with the rise of fructose consumption, with approximately 6 million Americans estimated to have progressed to NASH and 600,000 to Nash-related cirrhosis. Most people with NASH also have type 2 diabetes. NASH is now the third-leading reason for liver transplant in America.[30]

44.    Moreover, because the liver metabolizes sugar virtually identically to alcohol, the U.S. is now seeing—for the first time—alcohol-related diseases in children. Conservative estimates are that 31% of American adults, and 13% of American children suffer from NAFLD.[31]

**E.    Authoritative Bodies Recommend, for Good Health, Excluding or Minimizing Added Sugar Consumption**

45.    The 2020-2025 Dietary Guidelines for Americans "(DGA)" states that a healthy dietary pattern limits added sugars to less than 10 percent of daily calories, adding that "[w]hen added sugars in foods and beverages exceed 10 percent of calories, a healthy dietary pattern within calories limits is very difficult to achieve."[32]

---

[29] Geoffrey C. Farrell & Claire Z. Larter, *Nonalcoholic fatty liver disease: from steatosis to cirrhosis*, HEPATOLOGY, Vol. 433, No. 2 (Suppl. 1), S99-S112 (Feb. 2006); EE Powell et al., *The natural history of nonalcoholic steatohepatitis: a follow-up study of forty-two patients for up to 21 years*, HEPATOLOGY, Vol. 11, No. 1 (1990).

[30] Michael C. Charlton et al., *Frequency and outcomes of liver transplantation for nonalcoholic steatohepatitis in the United States*, GASTROENTEROLOGY, Vol. 141, No. 4, 1249-53 (Oct. 2011).

[31] Sarah M. Lindbäck et al., *Pediatric nonalcoholic fatty liver disease: a comprehensive review*, ADV. PEDIATR., Vol. 57, No. 1, 85-140 (2010); Mariana Lazo & Jeanna M Clark, *The epidemiology of nonalcoholic fatty liver disease: a global perspective*, SEMIN. LIVER DIS., Vol. 28, No. 4, 339-50 (2008); Jeffrey B Schwimmer et al., *Prevalence of Fatty Liver in Children and Adolescents*, PEDIATRICS, Vol. 118, No. 4, 1388-93 (2006); Jeffrey D Browning et al., *Prevalence of hepatic steatosis in an urban population in the United States: impact of ethnicity*, HEPATOLOGY, Vol. 40, No. 6, 1387-95 (2004).

[32]    *See*    2020-2025    DGA,    at    41,    *available    at* https://www.dietaryguidelines.gov/sites/default/files/2020-12/Dietary_Guidelines_for_Americans_2020-2025.pdf

46.     The Scientific Report of the 2020 Dietary Guidelines Advisory Committee was even stricter than what the USDA and HHS ultimately adopted, "suggest[ing] that **less than 6 percent** of energy from added sugars is more consistent with a dietary pattern that is nutritionally adequate . . . than is a pattern with less than 10 percent energy from added sugars."[33]

47.     The FDA, which previously did not set limits on added sugar for foods labeled "healthy," recently proposed a limit of ≤5 percent of the daily value (and thus ≤2 ½ grams of added sugar for adults and children ages 4 and older) for making such claims.[34] The proposal passed in fall 2023, was finalized and published in December 2024,[35] and went into effect in April 2025.[36]

48.     FDA describes the update as "a step towards providing the public with information that can help them identify food choices that can help lead to reducing diet-related chronic diseases."[37]

49.     The World Health Organization (WHO) recommends that no more than 10% of an adult's calories, and ideally less than 5%, come from free or added sugar.[38]

---

[33] USDA, "Scientific Report of the 2020 Dietary Guidelines Advisory Committee" (2020), Part A, p. 11 (emphasis added); *see also* Hope Warshaw & Steven V. Edelman, Practical Strategies to Help Reduce Added Sugars Consumption to Support Glycemic and Weight Management Goals, CLIN. DIABETES, Vol. 39,1 at 45-56 (Jan. 2021).

[34] Food Labeling: Nutrient Content Claims; Definition of Term "Healthy," 87 Fed. Reg. 59168, 59180 (Sept. 29, 2022) (to be codified at 10 C.F.R. § 101.65), *available at* https://www.govinfo.gov/content/pkg/FR-2022-09-29/pdf/2022-20975.pdf; *see also* Food Labeling: Nutrient Content Claims; Definition of Term "Healthy," Extension of Comment Period, 87 Fed. Reg. 73267 (Nov. 29, 2022).

[35] 89 Fed. Reg. 106064 (Dec. 27, 2024) (to be codified at 21 C.F.R. pt. 101), *available at* https://www.federalregister.gov/documents/2024/12/27/2024-29957/food-labeling-nutrient-content-claims-definition-of-term-healthy.

[36] *See* https://www.fda.gov/food/hfp-constituent-updates/fda-finalizes-updated-healthy-nutrient-content-claim.

[37] *See* https://www.fda.gov/consumers/consumer-updates/fresh-take-what-healthy-means-food-packages.

[38] World Health Organization, "Healthy Diet," *available at* https://www.who.int/news-room/fact-sheets/detail/healthy-diet.

50.    The American Heart Association (AHA) recommends restricting added sugar to 5% of calories.[39]

51.    The Centers for Disease Control and Prevention (CDC) warns that "[t]on much sugar in your diet can lead to health problems such as weight gain and obesity, type 2 diabetes, and heart disease."[40]

52.    The National Kidney Foundation explains "added sugars don't add anything but empty calories, so . . . there's no extra nutritional benefit to consuming these sugars." Sugar "may be a key factor contributing to our national obesity epidemic" because "the average American consumes almost 152 pounds of sugar each year, which breaks down to almost 3 pounds . . . of sugar each week."[41]

53.    The American Diabetes Association says "no matter what eating plan you follow, there are some basic guidelines that apply across the board," including "healthy eating plans" that contain "less added sugar.""[42] It clarifies fruit can "help you satisfy your sweet tooth **without the added sugar**."[43]

54.    The National Cancer Institute, reflecting on the scientific evidence, explains "dietary patterns that included higher intake of added sugars were associated with an increased risk of cardiovascular disease, cancers, and other negative health outcomes."[44]

---

[39] Rachel K. Johnson et al., *Dietary sugars intake and cardiovascular health: a scientific statement from the American Heart Association*, CIRCULATION, Vol. 120, 1011-20, at 1016-17 (2009).

[40] Centers for Disease Control and Prevention, "Know Your Limit for Added Sugars," https://www.cdc.gov/healthyweight/healthy_eating/sugar.html.

[41] National Kidney Foundation, "5 Sneaky Sources of Sugar," *Kidney.org*, https://www.kidney.org/atoz/content/5_Sneaky_Sources_of_Sugar (last accessed Mar. 7, 2024).

[42] American Diabetes Association, "Tips for Eating Well," *Diabetes.org*, https://diabetes.org/food-nutrition/eating-healthy (last accessed June 11, 2025).

[43] *Id.* (emphasis added).

[44] National Cancer Institute, "Updated Nutrition Facts Label Reflects Science on Diet and Health, Including Cancer," *cancer.gov* (May 19, 2020), https://www.cancer.gov/news-events/cancer-currents-blog/2020/nutrition-facts-label-updated-fda-nci.

*Testone v. Go Macro, LLC*
CLASS ACTION COMPLAINT

55.     The Harvard School of Public Health points out that "the Healthy Eating Plate does not include foods with added sugars."[45]

## III.    THE PRODUCTS' HEALTH AND WELLNESS REPRESENTATIONS ARE LIKELY TO MISLEAD REASONABLE CONSUMERS

56.     The Products contain between 4g at the low end (for the Kids Bars) and up to 13g of added sugar. These added sugar amounts account for at least ~11% of the total calories of each bar, and up to 24%, nearly *five times* the limit under the 2020-2025 DGA recommendation for a healthy dietary pattern. The specific amounts of added sugar in each of the Products is as follows:

| Flavor | Added Sugar (g) | Calories | Proportion Calories From Added Sugar |
|---|---|---|---|
| **Protein Bars** | | | |
| Salted Caramel + Chocolate Chip | 13 | 270 | 19.3% |
| Oatmeal Chocolate Chip | 12 | 270 | 17.8% |
| Peanut Butter Chocolate Chip | 12 | 290 | 16.6% |
| Coconut + Almond Butter + Chocolate Chips | 11 | 280 | 15.7% |
| Double Chocolate + Peanut Butter Chips | 13 | 280 | 18.6% |
| White Chocolate + Macadamia Nuts | 7 | 270 | 10.4% |
| Dark Chocolate + Almonds | 13 | 270 | 19.3% |
| Mint Chocolate Chip | 11 | 280 | 15.8% |
| Peanut Butter | 10 | 280 | 14.3% |
| Mocha Chocolate Chip | 12 | 270 | 17.8% |
| Blueberry + Cashew Butter | 11 | 280 | 15.8% |
| Banana + Almond Butter | 9 | 280 | 12.9% |
| Maple Sea Salt | 11 | 280 | 15.7% |

---

[45] Harvard T.H. Chan School of Public Health, "Added Sugar," *The Nutrition Source, available at* https://www.hsph.harvard.edu/nutritionsource/carbohydrates/added-sugar-in-the-diet (last reviewed Apr. 2022).

| Sunflower Butter + Chocolate | 11 | 270 | 16.3% |
| Lemon + Lemon | 12 | 270 | 17.8% |

**Snack Bars**

| Cherries + Berries | 10 | 200 | 20% |
| Granola + Coconut | 9 | 250 | 14.4% |

**Kids Bars**

| Cinnamons Roll | 4 | 110 | 14.5% |
| Chocolate Chip Cookie Dough | 6 | 100 | 24% |
| Double Chocolate Brownie | 6 | 100 | 24% |
| Oatmeal Chocolate Chip | 6 | 100 | 24% |
| Peanut Butter Cup | 5 | 110 | 18.2% |

57.    Because the scientific evidence establishes that consuming these amounts of added sugar is likely to increase the risk of cardiovascular disease, type 2 diabetes, metabolic disease, and liver disease, Go Macro's health and wellness representations concerning the Products are false and misleading.

58.    Go Macro is under a duty to disclose the harms associated with consuming the amount of added sugar in the Products to consumers because it is revealing some information about the Products—enough to suggest they are healthy—without revealing material information regarding the harmful effects of added sugar described herein.

59.    Go Macro is further under a duty to disclose this information because its deceptive omissions concern human health, specifically the detrimental health effects of consuming the Products.

60.    Go Macro is further under a duty to disclose this information because it was in a superior position to know of the dangers presented by the added sugars in the Products, as it is a large, sophisticated company that holds itself out as having expert knowledge regarding

the health impact of consuming the Products. By its own account, it is one of just six companies that "Runs the Better-For-You-World."[46]

61.    Finally, Go Macro is under a duty to disclose this information because, including through the acts alleged herein, it actively concealed material facts not known to Plaintiff and the Class concerning the detrimental effects of regularly consuming the Products.

62.    The disclosure of the gram amount of added sugar in the Products' Nutrition Facts Panels is insufficient to dispel Go Macro's misleading health and wellness claims and omissions. Not only are reasonable consumers not expected to inspect that information, but numerous studies demonstrate most consumers cannot make accurate assessments of a food's healthfulness based on the Nutrition Facts Panel, even when they do.

63.    In fact, Go Macro advises consumers pay little heed to the nutrition facts panel, and instead focus on the ingredient list, saying, "It is more important to know where your calories, carbohydrates, fat, etc. are coming from than just the numbers."[47]

64.    Research shows most consumers do not actually review the sugar content of products, and even those who do are often unable to accurately determine a products' healthfulness. The University of Minnesota's Epidemiology Clinical Research Center simulated a grocery shopping exercise on a computer equipped with an eye-tracking camera and found that, even for the relatively small subset of consumers that claim to "almost always" look at a product's sugar content (24%), ***only about 1% actually look beyond the calorie count to other components of the Nutrition Facts panel, such as sugar***.[48] Data from the survey suggests the average consumer reads only the top five lines on a Nutrition Facts label (serving size, calories, total fat, saturated fat, trans fat). Total and added sugar—listed

---

[46] *See* https://www.gomacro.com/press/who-runs-better-you-food-world-these-6-women.

[47] *See* https://www.gomacro.com/nutrition-facts.

[48] Dan J. Graham & Robert W. Jeffery, *Location, location, location: eye-tracking evidence that consumers preferentially view prominently positioned nutrition information*, J. AM. DIET. ASSOC. (2011) (emphasis added).

eleventh and twelfth on the Product labels—follows total fat, saturated fat, cholesterol, sodium, total carbohydrate, and dietary fiber, among other things.

65.    A survey of more than one hundred college students examined how those with differing levels of nutrition knowledge interpreted "intrinsic" cues (ingredient list) and "extrinsic" cues, such as an "all natural" labeling claim.[49]  The survey found that while those who had completed an upper-division nutrition course "used central route processing to scrutinize intrinsic cues and make judgments about food products," those who had not completed an upper-division nutrition course "did the opposite," relying on extrinsic cues.[50] The average consumer will thus more likely rely on labeling claims than the ingredient list or Nutrition Facts Box, to make a judgment about whether a food is healthy.

66.    Moreover, "mandated nutrition labels have been criticized for being too complex for many consumers to understand and use."[51] "Using NFP labels requires not only being able to read and perform arithmetic but also—just as importantly—the ability to reason with words and numbers. According[ly], a substantial proportion of consumers clearly struggle to effectively use the information contained in a nutrition label."[52]

67.    One survey found "[s]ubjects were not very good at using the [nutrition] label to make mathematical calculations, evaluate false claims, or draw dietary implications about a product," and "[r]esearch has consistently found that consumers have difficulty using label information if the task requires math."[53]  Accordingly, the authors concluded the nutrition

---

[49] Amber Walters et al., *The effect of food label cues on perceptions of quality and purchase intentions among high-involvement consumers with varying levels of nutrition knowledge*, J. NUTR. EDUC. BEHAV. 44(4): 350-54 (2012).

[50] *Id.*

[51] Alexander Persoskie et al., *US Consumers' Understanding of Nutrition Labels in 2013: The Importance of Health Literacy*, PREV. CHRONIC DIS. 14;170066 (2017) [hereinafter "Persoskie et al., US Consumers' Understanding"].

[52] *Id.* ("Some studies have found that even high school graduates and college students lack the basic health literacy skills to effectively apply nutrition label information[ ].").

[53] Alan S. Levy & Sara B. Fein, *Consumers' Ability to Perform Tasks Using Nutrition Labels*, J. NUTR. EDUC. & BEHAV. (1998).

label is "an inadequate tool for helping people to plan diets" and "unlikely to contribute by itself to a better or more critical understanding of nutrition principles."[54] In sum, the "mathematical skills of the American population present a significant barrier to following dietary recommendations based on quantitative tasks."[55]

68.    Consumers' inability to effectively use the nutrition label is particularly problematic in light of their tendency to rely heavily on symbolic cues of healthfulness. For example, in a survey of 164 consumers, participants were asked to evaluate the healthiness of two breakfast cereals based on the information provided in a nutrition table. For one group, "the label 'fruit sugar' was used; for the other, the label 'sugar' was used. Results suggest[ed] that the phrase 'fruit sugar' listed as an ingredient of the breakfast cereal resulted in a more positive perception of the healthiness of the cereal compared with the ingredient labeled 'sugar.'"[56]

69.    A recent survey of 2,000 U.S. participants demonstrated that "[t]he American population fails very clearly to identify healthy products . . . ."[57] In the survey, each participant was shown a collection of cereal bars and asked to rank them from healthiest to least healthy. The products' health "rankings were based off of the A through E Nutri-score

---

[54] *Id.*

[55] *Id.*

[56] Bernadette Sutterlin & Michael Siegrist, *Simply adding the word 'fruit' makes sugar healthier: The misleading effect of symbolic information on the perceived healthiness of food*, APPETITE (Dec. 2015) ("The labeling of the ingredients by making use of symbolic information may, consequently, exert a misleading effect on a consumer's assessment of the product's healthiness. The findings suggest that the effect is quite robust. A more profound and comprehensive evaluation of the provided information (as occurs with people with pronounced health consciousness) does not protect against the misleading effect of symbolic information and does not add to judgment accuracy. This indicates that relying and drawing on the symbolic meaning of information is, to a certain extent, an automatic and implicit process that cannot easily be corrected by increasing people's health consciousness.").

[57] Mansur Shaheen, "Only 9% of Americans can properly read a nutrition label with many falling for misleading labels like 'whole grain' or 'fat free' on the front of packaging," *Daily Mail* (Apr. 15, 2022) [hereinafter "Shaheen, *nutrition label*"], *available at* https://www.dailymail.co.uk/health/article-10722517/Only-9-Americans-properly-read-nutrition-label.html.

*Testone v. Go Macro, LLC*
CLASS ACTION COMPLAINT

used to grade some food products in the UK," and ultimately, "only 9% of participants were able to correctly identify which product was the healthiest[.]"[58]

70.     "Even more worrying, 13 percent identified the least nutritious food option as the healthiest—more than the amount who properly identified the healthiest."[59] This was despite that "60% actively are seeking food and beverage products to support their overall health," demonstrating "widespread confusion when it comes to determining what is and isn't healthy." [60]

71.     Thus, although "Americans are often advised to eat healthier, more nutritious foods in an effort to stifle the diabetes and the obesity epidemic striking the nation[,] [r]esearchers find that many cannot identify healthy foods in the grocery store aisle . . . ."[61] Instead, Americans were found to misidentify claims such as "whole grain" or "naturally flavored" as "markers that a food [is] healthy." These claims often "mislead people on what products are actually healthy for them," and "Americans' failure to identify healthy products is likely playing a role in the nation's budding obesity and diabetes epidemics."[62]

72.     The survey also looked at the impact of "call[ing] out the amount of different nutrients in their products . . . on the front of their packages" while ***not*** "also call[ing] out the amount of potentially less desirable ingredients, like sugars, sweeteners, sodium or saturated

---

[58] *Id.*

[59] *Id.*

[60] Sam Danley, "Study finds few consumers understand healthy food labels*," Supermarket Perimeter* (Mar. 16, 2022), *available at* https://www.supermarketperimeter.com/articles/7888-study-finds-few-consumers-understand-healthy-food-labels.

[61] Shaheen, *nutrition label, supra* n.57.

[62] *Id.*

*Testone v. Go Macro, LLC*
CLASS ACTION COMPLAINT

fats."[63] It found "this kind of potentially selective attribute labeling . . . had the biggest sway in leading consumers to make incorrect health-related choices."[64]

73.    Additionally, reading the Products' nutrition information is unlikely to sufficiently correct consumers' understanding of the healthfulness of the Products because the vast majority of consumers do not have the nutrition knowledge to accurately interpret the nutrition facts. In other words, "frequent use of nutrition labels does not promote understanding of [nutrient] levels."[65]

74.    A 2017 Shopper Trends Study by Label Insights found that "67% of consumers say it is challenging to determine whether a food product meets their [dietary] needs simply by looking at the package label[.]"[66]

75.    A 2021 survey found that "[c]onsumers perceive health differences even when two products have the same Nutrition Facts label" if there are packaging claims suggesting healthfulness.[67]

76.    In one survey, more than 3,000 U.S. adults viewed an ice cream nutrition label and then answered four questions that tested their ability to apply, understand, and interpret the nutrition information. Approximately 24% could not determine the calorie content of the full ice-cream container; 21% could not estimate the number of servings equal to 60g of

[63] Megan Poinski, "Fewer than 1 in 10 consumers can make healthy choices from front-of-pack labeling, study finds," *Food Dive* (Mar. 15, 2022), *available at* https://www.fooddive.com/news/fewer-than-1-in-10-consumers-can-make-healthy-choices-from-front-of-pack-la/620293.

[64] *Id.*

[65] Lisa M. Soederberg Miller & Diana L. Cassady, *The effects of nutrition knowledge on food label use: A review of the literature*, APPETITE (2015) (citing Elizabeth Howlett et al., *How modification of the nutrition facts panel influences consumers at risk for heart disease: The case of trans fat*, J. PUB. POL. & MARKET. (2008)).

[66] "Study Shows Labeling Often Confuses Consumers," *Packaging Strategies* (Mar. 30, 2017) *available at* https://www.packagingstrategies.com/articles/94081-study-shows-labeling-often-confuses-consumers (citing Label Insight 2017 Shopper Trends Study).

[67] International Food Information Council, "2021 Food & Health Survey," at 31 (2021), *available at* https://foodinsight.org/wp-content/uploads/2021/05/IFIC-2021-Food-and-Health-Survey.May-2021-1.pdf.

*Testone v. Go Macro, LLC*
CLASS ACTION COMPLAINT

carbohydrates; 42% could not estimate the effect on daily calorie intake of foregoing 1 serving; and 41% could not calculate the percentage daily value of calories in a single serving.[68] Only 53.9% of respondents who had earned a 4-year college degree could correctly answer all four nutrition label questions.[69]

77.     Recently, the FDA recognized that "many consumers would like to know how to use th[e] [Nutrition Facts] information more effectively and easily," and so published a guide on "How to Understand and Use the Nutrition Facts Label."[70] It took the FDA nearly twelve pages to explain how to "make it easier for you to use the Nutrition Facts labels to make quick, informed food decisions to help you choose a healthy diet."

78.     The problem is so severe that the FDA created an entire "education campaign" designed to "help consumers, health care professionals, and educators learn how to use [the Nutrition Facts Label] as a tool for maintaining healthy dietary practice," recognizing the current widespread confusion, even among "health care professionals," in how to properly use the Nutrition Facts to make healthy choices.[71]

[this space intentionally left blank]

---

[68] Persoskie et al., *US Consumers' Understanding, supra* n.51.

[69] *Id.*

[70] FDA, "How to Understand and Use the Nutrition Facts Label" (last updated Feb. 25, 2022), *available at* https://www.fda.gov/food/new-nutrition-facts-label/how-understand-and-use-nutrition-facts-label#top.

[71] *See* FDA, "The New Nutrition Facts Label—What's in it for you?" (last updated Apr. 13, 2022), *available at* https://www.fda.gov/food/nutrition-education-resources-materials/new-nutrition-facts-label.

*Testone v. Go Macro, LLC*
CLASS ACTION COMPLAINT

## IV.   THE PRODUCTS' LABELING VIOLATES STATE AND FEDERAL REGULATIONS

79.    The Products and their challenged labeling statements violate California Health and Safety Code §§ 109875, *et. seq.* (the "Sherman Law"), which has expressly adopted the federal food labeling requirements as its own. *See*, *e.g.*, *id.* § 110100; *id.* § 110670 ("Any food is misbranded if its labeling does not conform with the requirements for nutrition labeling as set forth in Section 403(r) (21 U.S.C. Sec. 343(r)) of the federal act and the regulation adopted pursuant thereto.").

80.    First, the challenged claims are false and misleading for the reasons described herein, in violation of 21 U.S.C. § 343(a), which deems misbranded any food whose "label is false or misleading in any particular." Go Macro accordingly also violated California's parallel provision of the Sherman Law. *See* Cal. Health & Safety Code § 110670.

81.    Second, despite making the challenged claims, Go Macro "fail[ed] to reveal facts that are material in light of other representations made or suggested by the statement[s], word[s], design[s], device[s], or any combination thereof," in violation of 21 C.F.R. § 1.21(a)(1). Such facts include the detrimental health consequences of consuming the Products.

82.    Third, Go Macro failed to reveal facts that were "[m]aterial with respect to the consequences which may result from use of the article under" both "[t]she conditions prescribed in such labeling," and "such conditions of use as are customary or usual," in violation of 21 C.F.R. § 1.21(a)(2)(ii). Namely, Go Macro failed to disclose the increased risk of serious chronic disease and death that is likely to result from consumption of the Products in the customary and prescribed manners.

## V.   PLAINTIFF'S PURCHASE, RELIANCE, AND INJURY

83.    Plaintiff Leah Testone has regularly purchased the Products throughout at least the past four years, with her last purchases in approximately 2024. During the last four years, up until approximately 2024, Plaintiff would purchase the Products, on average, about 10-15

times per year. Plaintiff would make her purchases from various brick-and-mortar stores, including Whole Foods, CVS, Walgreens, and, as best she can recall, Target stores located in San Diego and Los Angeles counties. Plaintiff would purchase single Protein Bars in Salted Caramel Chocolate Chip, Peanut Butter, and Coconut + Almond + Chocolate Chip flavors. She also occasionally purchased the Products from online retailers such as Amazon. As best she can recall, her last online purchase of the Products was in 2020 or 2021.

84.    When purchasing the Products, Ms. Testone was seeking a nutritious, healthy food, that is, the type of food whose regular consumption would not likely increase the risk of disease. In particular, the labeling of the Products, including the label statement that Go Macro Products are "a bar that's . . . good for you" led her to believe the Go Macro bars were a healthy choice for a snack or meal replacement. In purchasing the Products, Ms. Testone was exposed to, read, and relied on Go Macro's health and wellness representations described herein.

85.    The health and wellness representations, however, were and are deceptive because the Products are not healthy, and instead contain such high levels of added sugar that their regular consumption is likely to increase the risk of chronic disease.

86.    Plaintiff is not a nutritionist, food expert, or food scientist. Rather, she is a lay consumer, like other average consumers, who did not have the specialized knowledge that Go Macro had regarding the nutritional composition of the Products. At the time of purchase, Plaintiff was unaware of the extent to which consuming the amounts of added sugar found in the Products adversely affects health, or what amount of added sugar might have such an effect.

87.    Plaintiff acted reasonably in relying on the challenged labeling claims, which Go Macro intentionally placed on the Products' labeling with the intent to induce average consumers into purchasing the Products. Plaintiff was likewise induced to purchase the Products based on Go Macro's omissions and would have acted differently had Go Macro disclosed all material information.

*Testone v. Go Macro, LLC*
CLASS ACTION COMPLAINT

88.    Plaintiff would not have purchased the Products if she knew that the challenged labeling claims were false and misleading in that the Products are detrimental rather than beneficial to health.

89.    The Products cost more than similar products without misleading labeling and would have cost less absent Go Macro's false and misleading statements and omissions.

90.    Through the misleading labeling claims and omissions, Go Macro was able to gain a greater share of the market than it would have otherwise, and was able to increase the size of the market.

91.    Plaintiff paid more for the Products, and would only have been willing to pay less, or unwilling to purchase them at all, absent the false and misleading labeling complained of herein.

92.    Plaintiff would not have purchased the Products if she had known they were misbranded pursuant to California and FDA regulations, or that the challenged claims were false or misleading.

93.    For these reasons, the Products were worth less than what Plaintiff and the Class paid for them.

94.    Instead of receiving products that were healthy, Plaintiff and the Class received products likely to increase risk of disease when consumed regularly.

95.    Plaintiff and the Class lost money as a result of Go Macro's deceptive claims, omissions, and practices in that they did not receive what they paid for when purchasing the Products.

96.    Plaintiff still wishes to purchase healthy foods and continue to see the Products at stores when she shops. She would purchase the Products in the future if the Products were labeled truthfully, but unless Go Macro is enjoined in the manner Plaintiff seeks, she may not be able to rely on Go Macro's health and wellness claims in the future.

97.    Plaintiff's substantive right to a marketplace free of fraud, where she is entitled to rely with confidence on representations made by Go Macro, continues to be violated every time Plaintiff is exposed to the Products' misleading labeling claims.

98.    Plaintiff's legal remedies are inadequate to prevent these future injuries.

## CLASS ACTION ALLEGATIONS

99.    While reserving the right to redefine or amend the class definition prior to or as part of a motion seeking class certification, pursuant to Federal Rule of Civil Procedure 23, Plaintiff seek to represent a class of all persons the in United States, and a subclass of all persons in California, who, at any time from four years prior to the date of filing of this Complaint to the time a class is notified (the "Class Period"), purchased, for personal or household use, and not for resale or distribution, any of the Products (the "Class").

100.    The members in the proposed Class are so numerous that individual joinder of all members is impracticable, and the disposition of the claims of all Class Members in a single action will provide substantial benefits to the parties and Court.

101.    Questions of law and fact common to Plaintiff and the Class include:

a.    whether Go Macro communicated a message regarding the healthfulness of the Products through their packaging and advertising;

b.    whether that message was material, or likely to be material, to a reasonable consumer;

c.    whether the challenged claims are false, misleading, or reasonably likely to deceive a reasonable consumer;

d.    whether Go Macro's conduct is unfair or violates public policy;

e.    whether Go Macro's conduct violates state or federal food statutes or regulations;

f.    whether Go Macro made and breached warranties;

g.    the proper amount of damages, including punitive damages;

h.    the proper amount of restitution;

*Testone v. Go Macro, LLC*
CLASS ACTION COMPLAINT

i.      the proper scope of injunctive relief; and

j.      the proper amount of attorneys' fees.

102.   These common questions of law and fact predominate over questions that affect only individual Class Members.

103.   Plaintiff's claims are typical of Class Members' claims because they are based on the same underlying facts, events, and circumstances relating to Go Macro's conduct. Specifically, all Class Members, including Plaintiff, were subjected to the same misleading and deceptive conduct when they purchased the Products and suffered economic injury because the Products are misrepresented. Absent Go Macro's business practice of deceptively and unlawfully labeling the Products, Plaintiff and other Class Members would not have purchased them or would have paid less for them.

104.   Plaintiff will fairly and adequately represent and protect the interests of the Class, has no interests incompatible with the interests of the Class, and has retained counsel competent and experienced in class action litigation, and specifically in litigation involving the false and misleading advertising of foods and beverages.

105.   Class treatment is superior to other options for resolution of the controversy because the relief sought for each Class Member is small, such that, absent representative litigation, it would be infeasible for Class Members to redress the wrongs done to them.

106.   Go Macro has acted on grounds applicable to the Class, thereby making appropriate final injunctive and declaratory relief concerning the Class as a whole.

107.   As a result of the foregoing, class treatment is appropriate under Fed. R. Civ. P. 23(a), 23(b)(2), and 23(b)(3).

[this space intentionally left blank]

*Testone v. Go Macro, LLC*
CLASS ACTION COMPLAINT

# CAUSES OF ACTION

## FIRST CAUSE OF ACTION

### (on behalf of the California Subclass)

### Violations of the Unfair Competition Law, Cal. Bus. & Prof. Code §§ 17200 *et seq.*

108.    Plaintiff realleges and incorporate the allegations elsewhere in the Complaint as if set forth fully herein.

109.    The UCL prohibits any "unlawful, unfair or fraudulent business act or practice." Cal. Bus. & Prof. Code § 17200.

110.    The acts, omissions, misrepresentations, practices, and non-disclosures of as alleged herein constitute business acts and practices.

## Fraudulent

111.    A statement or practice is fraudulent under the UCL if it is likely to deceive a significant portion of the public, applying an objective reasonable consumer test.

112.    As set forth herein, the challenged labeling claims and omissions relating to the Products are likely to deceive reasonable consumers and the public.

## Unlawful

113.    The acts alleged herein are "unlawful" under the UCL in that they violate at least the following laws:

- The False Advertising Law, Cal. Bus. & Prof. Code §§ 17500 *et seq.*;
- The Consumers Legal Remedies Act, Cal. Civ. Code §§ 1750 *et seq.*;
- The Federal Food, Drug, and Cosmetic Act, 21 U.S.C. §§ 301 *et seq.*; and
- The California Sherman Food, Drug, and Cosmetic Law, Cal. Health & Safety Code §§ 110100 *et seq.*

114.    Because Plaintiff's claims under the UCL's "unlawful" prong include only one element—the violation of some predicate law or regulation—and do not require the public be likely to be deceived so that the reasonable consumer test is not an element of those claims, Plaintiff's legal remedies, which have additional elements including likelihood of deception

29

*Testone v. Go Macro, LLC*
CLASS ACTION COMPLAINT

under the reasonable consumer standard, are inadequate to fully compensate Plaintiff for all of Go Macro's unlawful acts. Because Plaintiff's losses may not be fully compensated by her legal damages, her legal remedies are inadequate.

## **Unfair**

115.  Go Macro's conduct with respect to the labeling, advertising, and sale of the Products was unfair because Go Macro's conduct was immoral, unethical, unscrupulous, or substantially injurious to consumers, and the utility of its conduct, if any, does not outweigh the gravity of the harm to its victims.

116.  Go Macro's conduct with respect to the labeling, advertising, and sale of the Products also was and is unfair because it violates public policy as declared by specific constitutional, statutory or regulatory provisions, including but not necessarily limited to the False Advertising Law, portions of the Federal Food, Drug, and Cosmetic Act, and portions of the California Sherman Food, Drug, and Cosmetic Law.

117.  Go Macro's conduct with respect to the labeling, advertising, and sale of the Products also was and is unfair because the consumer injury was substantial, not outweighed by benefits to consumers or competition, and not one that consumers themselves could reasonably have avoided. Specifically, the increase in profits obtained by Go Macro through the misleading labeling does not outweigh the harm to Class Members who were deceived into purchasing the Products, believing they were healthy, when in fact they are likely to detriment health.

118.  Go Macro profited from the sale of the falsely, deceptively, and unlawfully advertised Products to unwary consumers.

119.  Plaintiff and Class Members are likely to continue to be damaged by Go Macro's deceptive trade practices, because Go Macro continues to disseminate misleading information. Thus, injunctive relief enjoining Go Macro's deceptive practices is proper.

120.    Go Macro's conduct caused and continues to cause substantial injury to Plaintiff and other Class Members. Plaintiff has suffered injury in fact as a result of Go Macro's unlawful conduct.

121.    In accordance with Cal. Bus. & Prof. Code § 17203, Plaintiff seeks an order enjoining Go Macro from continuing to conduct business through unlawful, unfair, and/or fraudulent acts and practices, and to commence a corrective advertising campaign.

122.    Plaintiff and the Class also seek an order for the restitution of all monies from the sale of the Products, which were unjustly acquired through acts of unlawful competition.

123.    Because Plaintiff's claims under the "unfair" prong of the UCL sweep more broadly than their claims under the FAL, CLRA, or UCL's "fraudulent" prong, Plaintiff's legal remedies are inadequate to fully compensate Plaintiff and the Class for all of Go Macro's challenged behavior.

## SECOND CAUSE OF ACTION

### (on behalf of the California Subclass)

### Violations of the False Advertising Law, Cal. Bus. & Prof. Code §§ 17500 *et seq.*

124.    Plaintiff realleges and incorporate the allegations elsewhere in the Complaint as if set forth fully herein.

125.    The FAL provides that "[i]t is unlawful for any person, firm, corporation or association, or any employee thereof with intent directly or indirectly to dispose of real or personal property or to perform services" to disseminate any statement "which is untrue or misleading, and which is known, or which by the exercise of reasonable care should be known, to be untrue or misleading." Cal. Bus. & Prof. Code § 17500.

126.    It is also unlawful under the FAL to disseminate statements concerning property or services that are "untrue or misleading, and which is known, or which by the exercise of reasonable care should be known, to be untrue or misleading." *Id*.

127.   As alleged herein, the advertisements, labeling, policies, acts, and practices of Go Macro relating to the Products were likely to mislead consumers acting reasonably, as to the healthfulness of the Products.

128.   Plaintiff suffered injury in fact as a result of Go Macro's actions as set forth herein because Plaintiff purchased the Products in reliance on Go Macro's false and misleading marketing claims and omissions stating or suggesting that the Products are healthful and nutritious.

129.   Go Macro's business practices as alleged herein constitute unfair, deceptive, untrue, and misleading advertising pursuant to the FAL because Go Macro has advertised the Products in a manner that is untrue and misleading, which Go Macro knew or reasonably should have known, and omitted material information from the Products' labeling.

130.   Go Macro profited from the sale of the falsely and deceptively advertised Products to unwary consumers.

131.   As a result, Plaintiff, the Class, and the general public are entitled to injunctive and equitable relief, restitution, and an order for the disgorgement of the funds by which Go Macro was unjustly enriched.

132.   Pursuant to Cal. Bus. & Prof. Code § 17535, Plaintiff, on behalf of herself and the Class, seeks an order enjoining Go Macro from continuing to engage in deceptive business practices, false advertising, and any other act prohibited by law, including those set forth in this Complaint.

133.   Because the Court has broad discretion to award restitution under the FAL and could, when assessing restitution under the FAL, apply a standard different than that applied to assessing damages under the CLRA or commercial code (for Plaintiff's breach of warranty claims), and restitution is not limited to returning to Plaintiff and class members monies in which they have an interest, but more broadly serves to deter the offender and others from future violations, the legal remedies available under the CLRA and commercial code are more limited than the equitable remedies available under the FAL, and are therefore inadequate.

*Testone v. Go Macro, LLC*
CLASS ACTION COMPLAINT

### THIRD CAUSE OF ACTION

### (on behalf of the California Subclass)

### Violations of the Consumers Legal Remedies Act, Cal. Civ. Code §§ 1750 *et seq.*

134. Plaintiff realleges and incorporate the allegations elsewhere in the Complaint as if set forth fully herein.

135. The CLRA prohibits deceptive practices in connection with the conduct of a business that provides goods, property, or services primarily for personal, family, or household purposes.

136. Go Macro's false and misleading labeling and other policies, acts, and practices were designed to, and did, induce the purchase of the Products for personal, family, or household use by Plaintiff and Class Members, and violated and continue to violate the following sections of the CLRA:

     a.    § 1770(a)(5): representing that goods have characteristics, uses, or benefits which they do not have;

     b.    § 1770(a)(7): representing that goods are of a particular standard, quality, or grade if they are of another;

     c.    § 1770(a)(9): advertising goods with intent not to sell them as advertised; and

     d.    § 1770(a)(16): representing the subject of a transaction has been supplied in accordance with a previous representation when it has not.

137. Go Macro profited from the sale of the falsely, deceptively, and unlawfully advertised Products to unwary consumers.

138. Go Macro's wrongful business practices constituted, and constitute, a continuing course of conduct in violation of the CLRA.

139. Pursuant to California Civil Code § 1782, more than 30 days before filing this lawsuit, Plaintiff sent to Go Macro by certified mail, return receipt requested, written notice

*Testone v. Go Macro, LLC*
CLASS ACTION COMPLAINT

of his claims and Go Macro's particular violations of the Act, but Go Macro has failed to implement remedial measures.

140.    As a result, Plaintiff and the Class have suffered harm, and therefore seek actual damages resulting from purchases of the Products sold throughout the Class Period to all Class Members; punitive damages; injunctive relief in the form of modified advertising and a corrective advertising plan; restitution; and attorneys' fees and costs. *See* Cal. Civ. Code § 1782(d).

141.    In compliance with Cal. Civ. Code § 1780(d), an affidavit of venue is filed concurrently herewith.

### FOURTH CAUSE OF ACTION

### (on behalf of the California Subclass)

### Breaches of Express Warranties, Cal. Com. Code § 2313(1)

142.    Plaintiff realleges and incorporates the allegations elsewhere in the Complaint as if set forth fully herein.

143.    Through the Products' labeling, Go Macro made affirmations of fact or promises, or description of goods, that, *inter alia*, Products are healthy. These affirmations and descriptions include:

- "Finally – a bar that's both delicious and good for you!";
- "Live Long";
- "Eat Positive";
- "Be Well";
- "have a healthy body"; and
- A heart vignette.

144.    These representations were part of the basis of the bargain in that Plaintiff and the Class purchased the Products in reasonable reliance on those statements. Cal. Com. Code § 2313(1).

145.    Go Macro breached its express warranties by selling products that, for the reasons described herein, do not meet the above affirmations, promises, and product descriptions.

146.    That breach actually and proximately caused injury in the form of the lost purchase price that Plaintiff and Class Members paid for the Products.

147.    As a result, Plaintiff seeks on behalf of herself and other Class Members, actual damages arising as a result of Go Macro's breaches of express warranties, including, without limitation, expectation damages.

**FIFTH CAUSE OF ACTION**

**(on behalf of the California Subclass)**

**Breach of Implied Warranty of Merchantability, Cal. Com. Code § 2314**

148.    Plaintiff realleges and incorporates the allegations elsewhere in the Complaint as if set forth fully herein.

149.    Go Macro, through its acts set forth herein, in the sale, marketing, and promotion of the Products, Go Macro made representations, that, *inter alia*, the Products are healthy.

150.    A "warranty that the goods shall be merchantable is implied in a contract for their sale if the seller is a merchant with respect to goods of that kind." Cal. Com. Code § 2314(1). Go Macro is a merchant with respect to the goods of this kind which were sold to Plaintiff and the Class, and there were, in the sale to Plaintiff and the Class, implied warranties that those goods were merchantable.

151.    But in order for goods to be "merchantable," they must "[c]onform to the promises or affirmations of fact made on the container or label." Cal. Com. Code § 2314(2)(f).

152.    Go Macro breached that warranty of merchantability because, for the reasons discussed herein, the Products are not healthy, but rather their regular consumption detriments health. Thus, the Products are not merchantable in that they do not conform to the promises and/or affirmations of fact made on the labels.

153.    As an actual and proximate result of Go Macro's conduct, Plaintiff and the Class did not receive goods as impliedly warranted by Go Macro to be merchantable in that they did not conform to promises and affirmations made on the container or label of the goods.

154.    As a result, Plaintiff seeks actual damages, including, without limitation, expectation damages.

**SIXTH CAUSE OF ACTION**

**Negligent Misrepresentation**

155.    Plaintiff realleges and incorporate the allegations elsewhere in the Complaint as if fully set forth herein.

156.    As alleged above, Go Macro misrepresented the healthfulness of its Products and omitted that consuming the Products increases the risk of metabolic disease, cardiovascular disease, type 2 diabetes, and liver disease, and is further associated with increased all-cause mortality. These misrepresentations and omissions constituted a material fact in that a consumer's decision to purchase the Products would be influenced by the healthfulness of the Products.

157.    Go Macro's misrepresentations and omissions were made in the course of business transactions (the marketing, advertisement, sale, and purchase of the Products) in which both Plaintiff and Go Macro have a pecuniary interest.

158.    Go Macro knew or should have known that these representations and omissions were false or misleading, and it failed to exercise reasonable care in disseminating its labels and in its marketing and advertising.

159.    Go Macro possesses superior knowledge regarding the detrimental health effects of consuming the Products. Such knowledge is not readily available to consumers like Plaintiff and Class Members.

160.    Go Macro has a duty to consumers, like Plaintiff and Class Members, not to provide them with false information when they make purchasing decisions regarding the Products.

36

*Testone v. Go Macro, LLC*

CLASS ACTION COMPLAINT

161.    Go Macro holds itself out as an expert in nutrition and health science.

162.    Consumers lack nutritional science expertise that Go Macro possesses, and when Go Macro makes representations as to the healthfulness of its Products on its labels, consumers rely on Go Macro to provide truthful and complete information.

163.    Go Macro knew or should have known that Plaintiff and other consumers rely on Go Macro's labeling and health representations, and that its representations and omissions induce consumers like Plaintiff and Class Members into purchasing the Products.

164.    Plaintiff's injuries were proximately caused by Go Macro's misrepresentations and omissions. Plaintiff viewed Go Macro's labels prior to purchasing the Products, and the representations and omissions prompted her to purchase the Products. Had Plaintiff been aware of Go Macro's misrepresentations and omissions, she would have been unwilling to purchase the Products, or to purchase them at the price that she paid.

165.    Go Macro's misrepresentations regarding the Products are material to a reasonable consumer because they relate to bodily health, and reasonable consumers would attach importance to such representations and omissions, which would influence their purchasing decision.

166.    Therefore, as a direct and proximate result of Go Macro's negligent misrepresentations, Plaintiff and Class Members have suffered economic losses and other general and specific damages, in the amount of the Products' purchase price, or some portion thereof, and any interest that would have accrued on those monies, all in an amount to be proven at trial.


[this space intentionally left blank]

*Testone v. Go Macro, LLC*
CLASS ACTION COMPLAINT

## SEVENTH CAUSE OF ACTION

### Intentional Misrepresentation

167.    Plaintiff realleges and incorporate the allegations elsewhere in the Complaint as if set forth in full herein.

168.    Go Macro marketed the Products in a manner conveying to reasonable consumers that the Products are wholesome and healthy. Therefore, Go Macro has made misrepresentations about the healthfulness of the Products.

169.    Go Macro's misrepresentations regarding the Products are material to a reasonable consumer because they relate to bodily health. A reasonable consumer would attach importance to such representations and would be induced to act thereon in making purchasing decisions.

170.    At all relevant times, Go Macro knew that the misrepresentations were misleading, or has acted recklessly in making the misrepresentations, without regard to their truth.

171.    Go Macro intended that Plaintiff and other consumers rely on these misrepresentations on the Products' packaging.

172.    Plaintiff and the Class have reasonably and justifiably relied on Go Macro's intentional misrepresentations when purchasing the Products; had the correct facts been known, they would not have purchased the Products, or at least not at the prices at which the Products were offered.

173.    Therefore, as a direct and proximate result of Go Macro's intentional misrepresentations, Plaintiff and Class Members have suffered economic losses and other general and specific damages, in the amount of the Products' purchase price, or some portion thereof, and any interest that would have accrued on those monies, all in an amount to be proven at trial.

## EIGHTH CAUSE OF ACTION

### Unjust Enrichment

174.   Plaintiff realleges and incorporate the allegations elsewhere in the Complaint as if fully set forth herein.

175.   Plaintiff and Class Members conferred upon Go Macro an economic benefit, in the form of profits resulting from the purchase and sale of the Products.

176.   Go Macro's financial benefits resulting from its unlawful and inequitable conduct are economically traceable to Plaintiff's and Class Members' purchases of the Products, and the economic benefits conferred on Go Macro are a direct and proximate result of its unlawful and inequitable conduct.

177.   It would be inequitable, unconscionable, and unjust for Go Macro to be permitted to retain these economic benefits because the benefits were procured as a direct and proximate result of its wrongful conduct.

178.   As a result, Plaintiff and Class Members are entitled to equitable relief including restitution and/or disgorgement of all revenues, earnings, profits, compensation and benefits which may have been obtained by Go Macro as a result of such business practices.

## PRAYER FOR RELIEF

179.   Wherefore, Plaintiff, on behalf of themselves, all others similarly situated, and the general public, pray for judgment against Go Macro as to each and every cause of action, and the following remedies:

     a.    An Order declaring this action to be a proper class action, appointing Plaintiff as Class Representatives, and appointing Plaintiff's undersigned counsel as Class Counsel;

     b.    An Order requiring Go Macro to bear the cost of Class Notice;

     c.    An Order compelling Go Macro to conduct a corrective advertising campaign;

d.    An Order compelling Go Macro to destroy all misleading and deceptive advertising materials and product labels, and to recall all offending products;

e.    An Order requiring Go Macro to disgorge all monies, revenues, and profits obtained by means of any wrongful act or practice;

f.    An Order requiring Go Macro to pay restitution to restore all funds acquired by means of any act or practice declared by this Court to be an unlawful, unfair, or fraudulent business act or practice, or untrue or misleading advertising, plus pre-and post-judgment interest thereon;

g.    An Order requiring Go Macro to pay compensatory damages and punitive damages as permitted by law;

h.    An award of attorneys' fees and costs; and

i.    Any other and further relief that Court deems necessary, just, or proper.

## **JURY DEMAND**

180.    Plaintiff hereby demand a trial by jury on all issues so triable.


Dated: July 8, 2025            /s/ Trevor Flynn

**FITZGERALD MONROE FLYNN PC**
JACK FITZGERALD
*jfitzgerald@fmfpc.com*
MELANIE R. MONROE
*mmonroe@fmfpc.com*
TREVOR FLYNN
*tflynn@fmfpc.com*
PETER GRAZUL
*pgrazul@fmfpc.com*
ALLISON FERRARO
*aferraro@fmfpc.com*
2341 Jefferson Street, Suite 200
San Diego, California 92110
Phone: (619) 215-1741
***Counsel for Plaintiff***

*Testone v. Go Macro, LLC*
CLASS ACTION COMPLAINT